UNITED STATES OF AMERICA
DISTRICT COURT OF THE WESTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

**NANCY L. GRIFFITH**

Plaintiff,

v.

**COMPASS GROUP USA, INC.; CROTHALL HEALTHCARE, INC.,** a subsidiary of Compass Group USA, Inc.; **MARSHFIELD MEDICAL CENTER-DICKINSON,** a subsidiary of **DICKINSON COUNTY HEALTHCARE SYSTEM;** and **PATRICK DILL**, individually.

Defendants

Case No.

Hon.

U.S. Magistrate Judge

---

## COMPLAINT AND JURY DEMAND

Plaintiff Nancy L. Griffith files her complaint as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff is a resident of the County of Dickinson, Michigan.

2. Defendant Compass Group USA, Inc. ("Compass") is a foreign for-profit corporation doing business in Dickinson County, Michigan, with headquarters in Charlotte, North Carolina. Its resident agent is CSC - Lawyers Incorporating Service (Company), at 3410 Belle Chase Way, Ste. 600, Lansing, MI 48911.

3. Defendant Crothall Health Care, Inc. ("Crothall") is a subsidiary of Defendant Compass Group USA, Inc. Its resident agent is also CSC - Lawyers Incorporating Service (Company), at 3410 Belle Chase Way, Ste. 600, Lansing, MI 48911.

4. Hereafter, "Compass" or "Compass/Crothall" shall refer to both Defendant Compass and its subsidiary, Crothall.

5. Marshfield Medical Center-Dickinson ("Marshfield") is a subsidiary of Defendant Dickinson Healthcare System. Its registered agent is C T Corporation System, 40600 Ann Arbor Rd E Ste 201, Plymouth, MI 48170.

6. At all relevant times, Plaintiff worked at the Marshfield Medical Center – Dickinson, located within the County of Dickinson at 1721 S. Stephenson Ave., Iron Mountain, MI 49801.

7. At all relevant times, Plaintiff was jointly employed by Defendants Compass, Crothall, and Marshfield and these entities all had control over the essential terms of her employment.

8. Defendant Patrick Dill ("Mr. Dill") was, at all times relevant, the Regional Director of Operations for Crothall and directly supervised Plaintiff. He is sued in his individual capacity.

9. This lawsuit includes claims for age discrimination under the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-634; disability

discrimination under the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12111 et seq.; unpaid wages and overtime under the Fair Labor Standards Act 29 U.S.C. § 201 et seq.; age discrimination under the Elliott-Larsen Civil Rights Act, MCL § 37.2101 et seq.; disability discrimination under the Michigan Persons with Disabilities Civil Rights Act, MCL § 37.1101 et seq.; and unpaid wages and overtime under the Improved Workforce Opportunity Act MCL § 408.931 et seq.

10. This Court has subject matter jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. 1331 (federal question) and supplemental jurisdiction over Plaintiffs' related claims arising under state and local laws pursuant to 28 U.S.C. § 1367(a).

11. Venue is proper in the Western District of Michigan, Northern Division, as Plaintiff lives in Dickinson County, Michigan and the events giving rise to her claims occurred at her place of employment, in Dickinson County, Michigan.

12. Plaintiff filed an EEOC Charge (EEOC Charge No. 471-2025-02992) and received a Right to Sue letter from the EEOC on July 7, 2026.

13. This lawsuit is timely as it is filed within 90 days of her Right to Sue Letter.

## FACTUAL ALLEGATIONS

### Background

14. Ms. Griffith started working for the Dickinson County Hospital System ( “DCHS”) in 1988 as a ward clerk.

15. Over the next 35 years, she worked in various roles supporting the hospital and her community. She took pride in her work and was a valued team member.

16. In 2019, she was promoted to a management position, leading Marshfield’s Environmental Services (“EVS”) Department.

17. At that time, 28 environmental services aides (housekeepers) reported to her. Her team maintained the cleanliness of the hospital – a large part of which was infection prevention and control.

18. While employed by DCHS, Ms. Griffith’s performance reviews were uniformly positive, and she was a well-respected member of the management team.

19. Among other things, she led the charge to develop and implement a C-diff prevention plan, which eradicated C-diff (an intestinal bacteria) at the facility for over a year. The program was so successful, the hospital was recognized by the State of Michigan for its achievement.

20. Ms. Griffith served as manager of the EVS Department for DCHS until 2022, when DCHS was acquired by Marshfield Health System.

21. Following the acquisition, on or about May 25, 2022, Marshfield contracted out management of the EVS Department to Compass. Ms. Griffith became an employee of Compass while her housekeeping team remained employed by Marshfield pursuant to a collective bargaining agreement.

22. Although her job title changed to Assistant Director of Environmental Services, her job duties remained largely unchanged.

23. In this role, she directed and oversaw the operational needs of the EVS Department, managing and supervising EVS personnel (housekeepers), and maintaining and supporting the facility's goals and objectives.

24. Ms. Griffith was the only EVS management-level employee in Iron Mountain.

25. Originally, she reported to Marshfield's Unit Director Joanne Anderson, who worked in another state.

26. In August 2023, Ms. Griffith underwent surgery to remove hardware from a failed right ankle fusion.

27. She then underwent a second right ankle arthrodesis (fusion), which included sublateral joint reconstruction.

28. Both surgeries were successful, but recovery required Ms. Griffith to be off her feet for an extended period.

29. Accordingly, Ms. Griffith was granted unpaid medical leave and approved for short-term disability from August 8 through November 19, 2023.

30. Despite her absence, Compass did not replace Ms. Griffith. Accordingly, there was no immediate supervision or management of the EVS Department.

31. Disregarding her medical leave status, hospital administration and her EVS lead at the hospital reached out to Ms. Griffith for direction, as she had been their primary point of contact and was most knowledgeable about the facility and its needs.

32. A team player, Ms. Griffith didn't hesitate, jumping back into work from her bedside to prevent total chaos while she was recovering.

33. In short order, it was "business as usual" and Plaintiff continued to work from home every day, answering calls, emails, and managing the day-to-day affairs of the EVS Department as best she could from her bedside on a full-time basis.

34. Despite this, Ms. Griffith remained on unpaid leave. Her only source of income was in the form of short-term disability insurance benefits, which did not fully compensate her for the work she was doing.

35. Compass/Crothall was well aware of Ms. Griffith's unpaid leave status and that Marshfield administration was directing her employment activities during that time, and they acquiesced in it.

36. Toward the end of her recovery, in October 2023, Patrick Dill became her manager. Like Ms. Anderson, Mr. Dill was based out of state and managed from afar, while Marshfield directed her day-to-day activities on site.

37. Prior to returning to work, Ms. Griffith asked to have her office placed closer to the in-patient care area where her EVS team was working.

38. Her existing office was located two floors below and at the end of a very long hallway.

39. She explained that the accommodation would help her perform her job more efficiently as it would not take her as long to walk the distance it required to be near her staff.

40. Mr. Dill directed her to request accommodation through Ms. Anderson, which she did on or about October 3, 2023, in writing, following procedures. Her request was quickly denied.

41. On or about October 30, 2023, she submitted another written request, again explaining the need to be closer to her staff due to her ankle fusion so she could perform her managerial tasks more efficiently. This request was also denied, even though there were several vacant offices located in the vicinity of where her housekeepers were working.

42. Ms. Griffith returned to in-person work on or about November 21, 2023. It was only at that point that her salary was reinstated.

**Under Marshfield's Control, the Housekeeping Headcount was Slashed**

43. Earlier in 2023, the housekeeping team had been reduced from 28 to 21.4. This was at Marshfield's direction as it employed the housekeeping team pursuant to a collective bargaining agreement.

44. In 2024, at Marshfield's direction, it was further reduced to 14.3 FTEs, while housekeeping responsibilities increased with the addition of a new 8, 340 square foot cancer center.

45. Around this time, at Marshfield's further direction, Compass performed a manpower study to determine the appropriate headcount for the EVS Department.

46. The study was conducted by Kyle Koski, a Crothall employee. Mr. Koski determined that 21.93 FTE housekeepers were necessary to adequately cover the hospital and medical center.

47. Despite the study, the EVS Department was limited to 14 FTEs.

48. Ms. Griffith's housekeeping team was exhausted. They worked long shifts, often without taking breaks.

49. Mr. Dill was of little assistance; he rarely came to the site and was slow to respond to emails and phone calls.

50. Mr. Dill did, however, promptly respond with a site visit and inspection when notified by Marshfield that the EVS Department was in the 1% percentile on patient evaluation scores based on the return of PressGaney patient surveys.

51. The score baffled Ms. Griffith, as she routinely spoke with patients to ask them how their housekeeper was doing and the feedback she received was positive. Moreover, monthly, the scores were all in an acceptable range.

52. Based on the notice, on May 21, 2024, Mr. Dill and Ms. Griffith rounded with hospital staff to better understand the basis of the score, which rated room cleanliness.

53. They observed maintenance issues out of their control, including damaged walls, older flooring, and exterior windows that needed washing, but nothing that would explain the low housekeeping rating.

54. Following his visit, Mr. Dill acknowledged that while there was room for improvement, he did not understand the 1% score.

55. In an email to hospital administration, Mr. Dill noted: "Overall I must say I am perplexed by what I saw on my rounds yesterday in these areas. We can certainly do better, and we will but the condition of the rooms wasn't representative of a first percentile ranking in my opinion."

56. During the process of trying to understand the 1% rating, Ms. Griffith learned more about the survey.

57. She learned that, following discharge from the hospital, patients were asked how often their room and bathroom were kept clean during their stay.

58. Many times, patients were not present during cleaning so as not to disturb them so they had no way of knowing whether their housekeeper had been there, especially since the rooms were outdated and rundown, with old walls and flooring, and the exterior windows were dirty, giving off a "grungy" appearance.

59. Ms. Griffith was informed that the EVS Department only got credit for cleaning if a patient gave them a score of "always" in response to the one EVS question on the survey, and that not all patients returned the survey, and that some did not respond to the question.

60. As a result of her research, Ms. Griffith implemented a number of changes to draw patients' attention to the work performed by the housekeepers.

61. Among other things, she implemented a verification process, whereby the housekeepers placed a sticker on the toilet paper roll when the bathroom was cleaned.

62. As a result of these minor changes, which left a visual cue for patients to see, the EVS Department's scores improved dramatically.

63. The next month, following these changes, Ms. Griffith was informed that their score was in the 99th percentile.

64. Mr. Dill thanked her and praised her good work.

65. Justin Searles, assistant to Mr. Dill, also complimented her on the simplicity of the stickers and said that he planned to implement this change across the organization.

66. Despite these changes, the EVS Department continued to struggle with workload.

67. It was physically impossible to effectively complete the necessary work given the limited manpower and equipment.

**Ms. Griffith's Requests for Necessary Manpower and Equipment were Ignored**

68. In July 2024, Ms. Griffith put together a comprehensive proposal requesting four additional housekeepers, but her request was ignored by Defendants.

69. Among other things, she requested a dedicated FTE for the OB/GYN Department. Her lead EVS aide, Michelle Lundin, was responsible for cleaning the OB/GYN Department. Ms. Lundin was the best housekeeper on staff. Unfortunately, she was frequently pulled away from her duties by hospital administration due to lack of appropriate staffing. Accordingly, Ms. Griffith specifically requested that the open OB position be filled with an FTE.

70. In September 2024, Ms. Griffith submitted a new request for 3 FTEs. Once again, she put together a comprehensive plan documenting the ongoing need

for additional housekeepers to address ongoing concerns regarding the cleanliness of the facility. And, once again, nothing changed.

71. In addition to being short staffed, Ms. Griffith did not have access to modern or appropriate equipment to efficiently clean and maintain the hospital and clinic.

72. Many of the floors required stripping and waxing, which had to be done by hand. Even the newer vinyl flooring had to be done by hand due to the outdated equipment.

73. Ms. Griffith repeatedly requested new, modern equipment such as floor scrubbers, commercial vacuums, and floor machines, but none of her requests were granted.

**Ms. Griffith's 2024 Year-End Review Recognized the Staffing Challenges she Faced and Her Efforts to Counter Them**

74. Ms. Griffith's 2024 year-end review documented the drastic staffing cuts she faced, as well as the actions that she took to address these challenges.

75. Mr. Dill signed off on her evaluation on December 2, 2024, and it was presented to her on January 6, 2025.

76. Throughout December and January, Ms. Griffith continued to perform her job to the best of her ability given her limited housekeepers and equipment.

77. With no additional housekeepers and outdated equipment, the EVS Department continued to face challenges with staffing and coverage, but there was only so much that could be done with the limited resources provided.

**The Foot Injury**

78. On January 11, 2025, Ms. Griffith woke up with sharp pain in her left foot.

79. She was unable to bear weight on it, so she notified the appropriate personnel and worked from home.

80. After no improvement, she went to her doctor on January 14, 2026, and received a steroid prescription based on her history of osteoarthritis and was sent for an x-ray.

81. The next day, she was notified that she had a stress fracture in her metatarsal.

82. That day, she updated Mr. Searles, who was covering for Mr. Dill (who was on vacation) and emailed Mr. Dill to let him know of the situation.

83. On January 20, 2025, Ms. Griffith returned to work with no restrictions.

84. While there, she ran into Audrey Short in the cafeteria.

85. Ms. Short reported to Dylan Taylor, Director of Operations for Marshfield.

86. Ms. Short asked Ms. Griffith why she was limping and instructed her to file a worker's compensation claim. Ms. Griffith responded by indicating that she didn't know how or when her injury occurred.

87. Two days later, on January 22, 2025, Ms. Griffith received a phone call from Mr. Dill. She could tell from the tone of his voice that he was angry.

88. Mr. Dill told her that he had received a "disturbing text" from Mr. Taylor stating that she had broken her foot at work.

89. Ms. Griffith told him that she had a stress fracture but was not claiming it was work related. He then harshly responded, "So, what does that mean? Another short-term disability (referring to her "medical leave" in 2023)?"

90. Ms. Griffith responded by letting him know she was fine to work and had been approved to work by her doctor.

91. The phone call was very unsettling to Ms. Griffith. The tone and demeaning way Mr. Dill addressed her was very unprofessional; she had never been addressed in such a fashion in her 35+ year career at the hospital.

92. On or about January 6, 2025, Marshfield directed Compass and Dill to remove Ms. Griffith from her Assistant Director position.

93. On or about February 3, 2025, Mr. Dill notified Ms. Griffith that she was being removed from her position effective immediately due to a "business decision."

94. He then advised her that the only available positions were in housekeeping, which he knew she could not physically do, and he encouraged her to apply for unemployment. Her layoff notice dated February 2, 2025, indicated that her pay and benefits would continue for 30 days and that her employment would end March 5 unless she secured another position.

95. Consistent with her layoff notice, Ms. Griffith continued to work every day for the next month, helping transition her workload to Mr. Koski, the Compass employee who previously determined that the EVS Department was severely understaffed.

96. During this time, she was given permission to post for and hire three contracted housekeeping positions – positions she had requested in July and August 2024, to no avail.

97. Ms. Griffith was terminated from employment effective March 5, 2025.

98. Shortly after her termination, the EVS Department received the much-needed equipment Ms. Griffith had been requesting, including an automatic floor machine, strippers, buffers, and commercial grade vacuum cleaners.

## LEGAL ALLEGATIONS

### COUNT I
### Violation of the Age Discrimination in Employment Act
### (Defendants Compass/Crothall)

99. At all material times, Defendants Compass/Crothall were employers, covered by and within the meaning of the Age Discrimination in Employment Act of 1967, 29 U.S.C. 6121 et seq. ("ADEA").

100. Defendants terminated Plaintiff from her position because of her age and/or the misperception that she was too old to meet the demands of her job.

101. Defendants reasons stated reasons, and any reliance on the flawed survey, were pretext.

102. Defendant's actions have damaged Plaintiff as alleged herein and below.

### COUNT II
### Violation of the Americans with Disabilities Act
### (Defendants Compass/Crothall)

103. At all material times, Defendants Compass/Crothall were employers, covered by and within the meaning of the Americans with Disabilities Act of 1990, as amended, 42 U.S.C. § 12111 et seq. (ADA).

104. Ms. Griffith has a qualifying disability within the meaning of the ADA; she suffers from osteoarthritis, a chronic disease that causes degenerative joint damage, which has resulted in multiple injuries and orthopedic surgeries including:

2004 – Bilateral knee replacements

2014 – Posterior Tibial Tendon Rupture/repair

2020 – Lumbar Laminectomy

2021 – Right ankle fused

2023 – Removal of hardware (right ankle fusion failed)

2023 – Right ankle arthrodesis including sublateral joint reconstruction; and

2025 – Stress fracture in right foot

105. Ms. Griffith's osteoarthritis affects her mobility and has progressed with age, especially her ability to walk and stand on her feet for extended periods of time.

106. Despite the progression of her disease, Ms. Griffith was able to perform the essential functions of her position, with or without accommodation.

107. Ms. Griffith's supervisor (Mr. Dill) was aware of her disability and medical history based on prior discussions related to her medical leave of absence in 2023.

108. Alternatively, Ms. Griffith's supervisor regarded her as disabled.

109. Defendant discriminated against Ms. Griffith when it removed her from her position and then terminated her employment because of her disability (or perceived disability).

110. Defendant's actions have damaged Plaintiff as alleged herein and below.

**COUNT III**
**Age Discrimination**
**In Violation of the Elliott-Larsen Civil Rights Act**
**MCL §37.2101 *et seq.***
**(All Defendants)**

111. Defendants Compass/Crothall were, at all relevant times, employers as defined by the Elliott-Larsen Civil Rights Act (ELCRA).

112. As an agent of Compass/Crothall, Defendant Dill is also liable under MCL § 37.2202(1)(a), which provides that an "Employer" means a person that has 1 or more employees, and includes an agent of that person.

113. Defendant Marshfield was a joint employer of Ms. Griffith as it shared or co-determined those matters governing essential terms and conditions of Ms. Griffith's employment, including control of the personnel under her, the number of those personnel, and the hospital surveys that ultimately were used as a factor in terminating her employment.

114. Defendant Marshfield also had the ability to hire, fire or discipline Ms. Griffith, affect her compensation and benefits, and direct and supervise her performance, as evidenced by their direction to Compass/Crothall to terminate her employment as Assistant Director.

115. Defendant Dill, as noted above, exhibited discriminatory animus, and did terminate Ms. Griffith's employment as Assistant Director and eventually terminated her employment altogether.

116. Plaintiff was, at all relevant times, a member of a protected group under the ELCRA, based on her age (63 at time of termination).

117. Plaintiff was qualified for her position as Assistant Director of EVS.

118. Defendants terminated Plaintiff because of her age.

119. Defendants replaced Plaintiff with two different younger males, who were then given the personnel and equipment Plaintiff had requested so that the EVS Department could be successful.

120. Defendants' actions have damaged Plaintiff as described above and herein.

**COUNT IV**
**Disability Discrimination**
**In Violation of Michigan Persons with Disabilities Civil Rights Act**
**MCL § 37.1101 *et seq.***
**(Defendants Compass/Crothall and Marshfield)**

121. Defendant Compass/Crothall were employers and Plaintiff an employee as defined by the PDCRA.

122. Defendant Marshfield is a joint employer as described above.

123. Plaintiff suffered from osteoarthritis and was disabled within the meaning of the PDCRA.

124. Plaintiff was able to perform her job with or without accommodation.

125. Defendants were aware of Plaintiff's disability and medical history and/or perceived her as disabled.

126. Plaintiff requested accommodation of Defendants when she asked to be provided with an office closer to her housekeeping staff.

127. The requested accommodation was reasonable and would not have caused an undue hardship for Defendants, as there were several vacant offices in that area.

128. Defendants did not engage in a sincere, good faith effort to provide reasonable accommodation, resulting in the denial of the request and making it more difficult for Plaintiff to efficiently perform her job.

129. Plaintiff was discriminated against when Defendants failed to assist or advocate for her request for reasonable accommodation.

130. Plaintiff was further discriminated against when she was removed her from her position and terminated based on her disability and/or the false perception that she was no longer able to perform the essential functions of her position as Assistant Director of Environmental Services.

131. Defendants' actions have damaged Plaintiff as described above and herein.

**COUNT V**
**Violations of the Fair Labor Standards Act**
**29 U.S.C. § 201 *et seq.***
**(Defendants Compass/Crothall and Marshfield)**

132. Defendants Compass/Crothall and Marshfield were, at all relevant times, covered employers within the meaning of the Fair Labor Standards Act (FLSA), 29 U.S.C. § 201 et seq.

133. Plaintiff was, at all relevant times, an employee of Defendants within the meaning of the FLSA.

134. From August 8, 2023, through November 19, 2023, Plaintiff was placed on unpaid medical leave while she underwent two ankle surgeries and recovery therefrom.

135. Despite her medical leave status, it was “business as usual” and Plaintiff continued to work from home every day, answering calls, emails, and managing the day-to-day affairs of the EVS Department on a full-time basis.

136. Both hospital administration and Defendants Compass/Crothall were aware of the demands being placed on Plaintiff, but they turned a blind eye to the fact that she was not being paid her regular salary and only receiving short-term disability insurance payments (a fraction of what she was entitled to).

137. It was only after Plaintiff returned to the job site that her salary was reinstated.

138. Defendants' failure to pay Plaintiff's salary while she continued to work from home constituted an improper deduction, resulting in her misclassification as an exempt employee.

139. Unless properly characterized as an exempt employee, the FLSA requires employers to pay employees the federally mandated minimum wage for all hours worked as well as an overtime rate of one and one-half their regular rate of pay for all hours worked over 40 in a work week. 29 U.S.C. §§206, 207(a)(1).

140. Defendants did not pay Plaintiff anything for the work she performed August 8, 2023, through November 19, 2023.

141. Defendants' actions violated the FLSA and were knowing and willful.

142. As a result of Defendants' violations, Plaintiff is entitled to her unpaid wages, overtime, plus an additional equal amount in liquidated damages, costs, and reasonable attorney fees, to be determined at trial.

**COUNT VI**
**Violation of the Improved Workforce Opportunity Act**
**MCL § 408.931 *et seq*.**
**(Defendants Compass/Crothall and Marshfield)**

143. Michigan's Improved Workforce Opportunity Act (IWOWA) makes it unlawful for an employer to pay an employee less than what is proscribed by statute. MCL § 408.931 et seq.

144. At all relevant times, Defendants Compass/Crothall and Marshfield were employers and Plaintiff was an employee within the meaning of the IWOWA.

145. The IWOWA requires employers to pay employees the state mandated minimum wage for every hour worked in a workweek and time and one half for all hours worked over forty in a work week.

146. Defendants violated the IWOWA by failing to pay Plaintiff the state mandated minimum wage and overtime amounts while she worked full-time from home August 8, 2023, through November 19, 2023, including responding to inquiries and emergencies on nights and weekends.

147. As a result of Defendants' violations, Plaintiff is entitled to her unpaid wages, overtime, plus an additional equal amount in liquidated damages, costs, and reasonable attorney fees, to be determined at trial.

**COUNT VII**
**BREACH OF CONTRACT**
**(Defendant Compass/Crothall)**

148. Plaintiff's employment with Defendant Compass/Crothall was contractual.

149. Defendant failed to pay Plaintiff her agreed on bi-weekly salary August 8, 2023, through November 19, 2023, even though she worked from home on a full-time basis.

150. Defendant's failure to pay Plaintiff her agreed on bi-weekly salary August 8, 2023, through November 19, 2023, constitutes a breach of contract.

151. Defendant's breach damaged Plaintiff as described above and herein.

## DAMAGES

152. As a direct and proximate result of Defendant's conduct, Plaintiff has suffered economic damages and non-economic damages including reputational harm, emotional distress, mental and physical anguish, humiliation, and embarrassment, and will so suffer in the future.

## JURY DEMAND

Plaintiff demands a jury trial.

## RELIEF REQUESTED

***W H E R E F O R E,*** Plaintiff requests this honorable court grant then the following relief:

A. Accept jurisdiction over this matter;

B. Award Plaintiff appropriate equitable relief;

C. Award Plaintiff compensatory damages;

D. Award Plaintiff exemplary damages;

E. Award Plaintiff punitive damages;

F. Award Plaintiff liquidated damages;

G. Award Plaintiff reasonable attorney fees, costs, and interests; and

H. Award such other relief as this Court deems just and proper.

Respectfully submitted,

Attorneys for Plaintiff

**ROUMEL LAW**

*/s/ Nicholas Roumel*

Nicholas Roumel (P37056)
4101 Thornoaks Dr.
Ann Arbor MI 48104
(734) 645-7507
*Nick@roumel-law.com*

**MARCOTTE LAW, PLLC**

*/s/ Wendy E. Marcotte*

Wendy E. Marcotte (P74769)
102 W. Washington St., Ste. 213
Marquette MI 49855
(906) 204-5343
*Wendy@marcottelaw.us*

September 13, 2026